Slip Op. 18-20

## UNITED STATES COURT OF INTERNATIONAL TRADE

UNITED STATES,

       Plaintiff,

v.

RUPARI FOOD SERVICES, INC.,

       Defendant.

Before:  Gary S. Katzmann, Judge

Consol. Court No. 10-00119

## OPINION

[Plaintiff's motion for default judgment pursuant to USCIT Rule 55(b) is granted.]

Dated: March 9, 2018

Mikki Cottet, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Plaintiff. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, of Washington, DC. Of counsel on the brief was Brian J. Redar, Deputy Associate Chief Counsel, U.S. Customs and Border Protection, of Miami, Fl.

Lawrence M. Friedman, Barnes Richardson & Colburn, of Chicago, IL and Peter A. Quinter, Gray Robinson, P.A., of Miami, FL, for Defendant, on the motion for summary judgment.

      Katzmann, Judge:  The court today issues default judgment in a case whose background spans more than two decades, and which has seen the reorganization of a federal agency, a bankruptcy, the withdrawal of counsel, and an issue of first impression before this Court.[1]

Plaintiff, the United States ("the Government"), on behalf of United States Customs and Border

---

[1] See United States v. Rupari Food Servs., Inc., 41 CIT ___, 254 F. Supp. 3d 1367 (2017), discussed infra p.17.

Protection ("Customs"),[2] brought this action against defendant, Rupari Food Services, Inc. ("Rupari") to recover civil penalties in the amount of $2,784,636.18, plus post-judgment interest and costs as provided by law, for Rupari's alleged fraudulent violation of Section 592 of the Tariff Act of 1930, 19 U.S.C. § 1592(a)[3] (2012).[4] Pl.'s Am. Compl. ¶¶ 70–72, 78, Aug. 31, 2015, ECF No. 110 ("Am. Compl."). The Government alleges that Rupari knowingly and falsely claimed that five seized entries of frozen Chinese crawfish tail meat, which Seamaster Trading Co., Ltd. ("Seamaster") attempted to enter into the United States in 1998 and which were subject to an antidumping duty order, originated in Thailand. Id.

After years of proceedings before Customs and litigation before this court, described infra, as well as several stays in proceedings and extensions of filing deadlines, on April 10, 2017, Rupari filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Joint Status Report, Apr. 17, 2017, ECF No. 148. On November 2, 2017, the Clerk of Court entered default judgment against Rupari pursuant to USCIT Rule 55(a). ECF No. 172.

The Government now moves for default judgment pursuant to USCIT Rule 55(b), over which motion the court has jurisdiction pursuant to 28 U.S.C. § 1582(1) (2012). Pl.'s Mot. for

---

[2] At the inception of these events, Customs was known as the United States Customs Service. After March 1, 2003, the United States Customs Service was split into two agencies within the newly created Department of Homeland Security. The functions of the United States Customs Service relevant to this case were assumed by United States Customs and Border Protection. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002).

[3] 19 U.S.C. § 1592(a)(1)(A)(i) mandates, in relevant part, that "[w]ithout regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no person, by fraud, gross negligence, or negligence . . . may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of . . . any document or electronically transmitted data or information, written or oral statement."

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition, unless otherwise noted.

Default J. and Mem. in Support of Pl.'s Mot. ("Pl.'s Br."), Dec. 18, 2017, ECF No. 173.  The

Government asks the court to enter default judgment against Rupari for civil penalties in the

amount of $2,784,636.18, the alleged domestic value of the merchandise whose entry was

attempted, plus post-judgment interest and costs as provided by law.  Id. at 1; Pl.'s Br. Decl. of

Yolanda Benitez ("Benitez Decl.") ¶¶ 3, 10, Dec. 15, 2017, ECF No. 173-2; Pl.'s Br. Attach. A

("Attach. A"), ECF No. 173-2.[5]

Because the Government's well-pleaded complaint and supporting evidence adequately

establish Rupari's liability for a fraudulent violation of Section 1592 as a matter of law, and

because the Government's claim is for a civil penalty amount within the statutory limit for such

violations, the court grants the Government's motion for a default judgment, insofar as it seeks

fixation of a penalty amount rather than enforcement of that penalty.

## BACKGROUND

The court notes at the outset that a defendant who defaults thereby admits all well-pleaded

factual allegations contained in the complaint.  See, e.g., United States v. NYCC 1959 Inc., 40 CIT

___, 182 F. Supp. 3d 1346, 1347 (2016) (citing City of New York v. Mickalis Pawn Shop, LLC,

645 F.3d 114, 137 (2d Cir. 2011)); United States v. Deladiep, Inc., 41 CIT ___, ___, 255 F. Supp.

3d 1326, 1336 (2017) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)).

The following facts are undisputed.

---

[5] Certain of the Government's citations and supportive exhibits, such as the Benitez Decl. and
Attach. A, represent the civil penalties sought as totaling $2,784,636.17, rather than $2,784,636.18
-- a discrepancy of one cent.  Even though the Amended Complaint states that the "[t]he domestic
value of the merchandise Rupari attempted to enter into the United States was $2,784,636.17,"
Am. Compl. ¶ 63, the court considers the amount of $2,784,636.18 to be correct, as this is the
amount sought in the Government's Prayer for Relief, Am. Compl. ¶ 78.  Further, as explained
infra n.10, the mathematical subtotals of the itemized values associated with the civil penalties
sought, which are listed in Attach. A, yield a grand total of $2,784,636.18.

A.  Factual Background

At the time of the events giving rise to this action, Rupari was a Florida corporation that

purchased crawfish from abroad and sold it to restaurants in the United States.  Am. Compl. ¶ 3;

Ans. to Am. Compl. ¶ 3, Sept. 21, 2015, ECF No. 11 ("Ans."); Ct. No. 11-00203, Original Compl.

Against Rupari, ¶¶ 3, 12, June 20, 2011, ECF No. 2; Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss

("Pl.'s Opp'n") Ex. 10 at 13, Purchase Agreement, Mar. 7, 1997, ECF No. 94-6.  Rupari's seafood

sales team consisted of Larry Floyd, Vice President of Rupari's Seafood Sales Division, and

William Vincent ("Rick") Stilwell, a commissioned seafood salesman.  Am. Compl. ¶ 14; Ans. ¶

14; Def. Rupari Food Services, Inc. R. 56.3 Stmt., Sec. I. "Response to Plaintiff's Statement of

Facts" ¶ 3, Feb. 24, 2016, ECF No. 120-12 ("Def. RPSF");[6] Pl.'s Opp'n Ex. 1, Tr. of Dep. of

William Vincent Stilwell ("Stilwell Dep.") at 13–14, Apr. 3, 2013, ECF No. 94-1; Pl.'s Opp'n Ex.

2, Tr. of Dep. of Rupari Food Services Inc. ("Rupari Dep.") at 15–17, Apr. 4, 2013, ECF No. 94-

2.

From March 1, 1996 through August 31, 1996, the United States Department of Commerce

("Commerce") conducted an antidumping investigation concerning crawfish tail meat from the

People's Republic of China ("China").  Am. Compl. ¶ 9; Ans. ¶ 9.  Commerce published the final

determination of its antidumping investigation of freshwater crawfish tail meat from China on

August 1, 1997.  Freshwater Crawfish Tail Meat From The People's Republic Of China, 62 Fed.

---

[6] At the time that the Government filed its motion for summary judgment on January 15, 2015, see
infra, the USCIT Rules did not require the annexation of a statement of undisputed facts.  Compare
USCIT R. 56.3(b) (2015) ("In the papers opposing a Rule 56 motion for summary judgment, the
factual positions described in Rule 56(c)(1)(B) must include correspondingly numbered
paragraphs responding to the numbered paragraphs in the statement of the movant[.]").  In its
February 24, 2016 response to the Government's motion, Rupari numbered certain sentences
contained in the facts section of the Government's motion for summary judgment and responded
to them as if they had been set out in separately numbered paragraphs.  See Def. RPSF.

Reg. 41,347 (Dep't Commerce Aug. 1, 1997) (subsequently amended to correct ministerial errors at 62 Fed. Reg. 48,218 (Dep't Commerce Sept. 15, 1997)) (Final Determination) ("Antidumping Duty Order").  Commerce determined that Chinese crawfish tail meat was being sold for less than fair value and entered Antidumping Duty Order A-570-848, which covers "freshwater crawfish tail meat, in all its forms (whether washed or with fat on, whether purged or unpurged), grades, and sizes; whether frozen, fresh, or chilled; and regardless of how it is packed, preserved or prepared," and excludes live and other whole crawfish.  Id. at 48,219.  Commerce calculated the "China-wide" antidumping duty rate, applicable to Chinese crawfish tail meat exporters other than those specifically identified and individually examined, to be 201.63 percent.  Id. at 48,219.

Lianyugang Yupeng Aquatics Products Co. Ltd., also known as Yupeng Fisheries Ltd. ("Yupeng"), a Chinese producer and exporter of crawfish tail meat, was among the firms investigated by Commerce.  Am. Compl. ¶ 11; Ans. ¶ 11.  Yupeng did not receive a separate antidumping rate, and its crawfish tail meat exports were subject to the China-wide rate of 201.63 percent.  Am. Compl. 12; Ans. ¶ 12; Antidumping Duty Order at 41,358.

From 1996 to 1998, Yupeng sold Rupari whole cooked frozen crawfish and crawfish tail meat.  Am. Compl. ¶ 13; Ans. ¶ 13; Def. RPSF ¶ 2; Stilwell Dep. at 17–18.  Rupari's seafood sales team engaged in multiple communications with Yupeng regarding crawfish.  Am. Compl. ¶ 14; Ans. ¶ 14; Def. RPSF ¶ 3.  They communicated with Tian Wei, a Yupeng salesman, and with Wang Yon Min, Yupeng's owner, regarding the sale of crawfish to Rupari.  Am. Compl. ¶ 15; Ans. ¶ 15; Stilwell Dep. at 12, 21.

In 1997 and 1998, Rupari sold crawfish to members of the Popeye's Operators' Purchasing Cooperative Association ("POPCA").  Am. Compl. ¶ 23; Ans. ¶ 23.  Richard L. Porter, the POPCA director of purchasing and distribution, communicated with Rupari through Floyd regarding the

sale of crawfish. Am. Compl. ¶ 24; Ans. ¶ 24; Pl.'s Opp'n Ex. 10 at 1, Decl. of Richard L. Porter

("Porter Decl.") ¶¶ 6–7, Mar. 16, 2014, ECF No. 94-6. On March 7, 1997, Porter and Floyd signed

a Purchase Agreement wherein Rupari would sell POPCA 148,000 pounds of "Chinese [c]rawfish

[t]ail [m]eat." Am. Compl. ¶ 25; Ans. ¶ 25; Purchase Agreement at 13. The agreement also stated

that a formal POPCA supply agreement would be sent shortly thereafter. Purchase Agreement at

13. Floyd and Porter consummated the formal POPCA supply agreement on June 8, 1997. Am.

Compl. ¶ 25; Ans. ¶ 25; Purchase Agreement at 14.

On October 17, 1997, POPCA sent Floyd and Rupari a letter confirming that Popeye's

would purchase 1,500 cases of crawfish. Pl.'s Opp'n Ex. 10 at 30, Crawfish Confirmation Letter

from James Brailey, Purchasing Manager, POPCA, to Floyd, Oct. 17, 1997.

In November 1997, Wang, Yupeng's owner, created Seamaster, which was located in

Thailand. Am. Compl. ¶ 16. Yupeng shipped crawfish tail meat from China to Seamaster in

Thailand. Pl.'s Ex. 6, Opp'n Packing List, Bill of Lading, Invoice, Manifest or Freight List, ECF

No. 94-5. Rupari was aware that Wang created Seamaster and was the principal owner of both

Yupeng and Seamaster. Am. Compl. ¶ 17; Rupari Dep. at 5.

Wang approached Somchai Sriviroj, the owner and managing director of Sea Bonanza

Foods Company ("Sea Bonanza"), a fish processing company in Thailand, and asked if Sea

Bonanza could repackage frozen crawfish tail meat. Pl.'s Opp'n Ex. 4, Tr. of Dep. of Sea Bonanza

Foods Company, Ltd. at 8, July 8–9, 2013, ECF No. 94-3 ("Sea Bonanza Dep.").

On November 8, 1997, Seamaster entered into a contract with Sea Bonanza wherein

Seamaster would ship crawfish tail meat from China to Thailand, and Sea Bonanza would

repackage the crawfish tail meat in exchange for a processing fee. Am. Compl. ¶¶ 18–19; Pl.'s

Opp'n Ex. 5, Contract between Seamaster and Sea Bonanza at 2, Nov. 8, 1997, ECF No. 94-4.

In January and April 1998, Yupeng shipped from China to Seamaster, in Thailand, product invoiced as "frozen crawfish." Am. Compl. ¶ 20; Def. RPSF ¶ 12; Invoice at 1, 3, Jan. 8, 1998. Sea Bonanza repacked the crawfish tail meat for Seamaster and labelled the meat a "Product of Thailand." Am. Compl. ¶ 21; Def. RPSF ¶¶ 14–15; Sea Bonanza Dep. at 8, 22. According to the Agricultural Affairs Office at the American Embassy in Bangkok, crawfish is not harvested in Thailand; moreover, Sea Bonanza never processed live crawfish. Sea Bonanza Dep. at 22–24, 44; Packing List at 1, Apr. 18, 1998; Pl.'s Opp'n Ex. 8, Facsimile from the Agricultural Affairs Office at the American Embassy in Bangkok, Thailand to Roy Johnson, Louisiana Dept. of Agriculture at 1, Aug. 5, 1998, ECF No. 94-5.

Rupari assisted Seamaster with obtaining a customs broker, and Seamaster became a non-resident importer. Rupari Dep. at 4; Pl.'s Opp'n Ex. 11A at 1–42, Entry Documents, Mar. 13, 1998, ECF No. 94-7 ("Entry Documents"). Rupari stopped purchasing crawfish tail meat directly from Yupeng and began purchasing crawfish tail meat from Seamaster. Stilwell Dep. at 18, 20. Rupari had never previously purchased crawfish from a source in Thailand prior to purchasing crawfish tail meat from Seamaster. Id.

On February 24, 1998, Porter sent a letter to Caro Produce regarding POPCA's Crawfish Etouffee promotion beginning March 9, 1998, and ending April 11, 1998. Pl.'s Opp'n Ex. 10 at 36, Letter from Porter to Caro Produce-Angel Homan, Feb. 24, 1998. The letter recited that POPCA had ordered 1,200 cases of crawfish in 24.1 pound bags from Rupari. Id.

On March 13, 1998, Seamaster filed a consumption entry describing the imported merchandise as 1,900 cartons of frozen crawfish, classified under U.S. Harmonized Tariff Schedule ("HTSUS") 0306.19.0010, free of duty, and marked as a product of Thailand. Am. Compl. ¶ 32; Entry Documents at 1, Entry Summary.

On April 18, 1998, Seamaster filed three consumption entries that described the imported

merchandise as 1,750 cartons of cooked crawfish meat, classified under HTSUS 1605.40.1000,

free of duty, and marked as products of Thailand.  Am. Compl. ¶ 33; Entry Documents at 10, Entry

Summary.  Seamaster did not identify any of the entries as being subject to antidumping orders as

required by 19 C.F.R. § 141.61(c) (1998).  Am. Compl. ¶ 34; Entry Summary at 10.  19 C.F.R. §

141.61(c) (1998) states:

> Identification number for merchandise subject to an antidumping or
> countervailing duty order.  The entry summary filed for merchandise
> subject to an antidumping or countervailing duty order shall include
> the unique identifying number assigned by [Commerce]. Any entry
> summary filed for merchandise subject to an antidumping or
> countervailing duty order not containing the identifying number
> shall be rejected.

Rupari was listed as the notifying party on certificates of origin that accompanied these

four entries.  Am.  Compl. ¶ 35; Ans. ¶ 35; Entry Documents at 7, 15, 26, 37.  The entry summaries,

entry documents, invoices, and certificates of origin all stated that the crawfish meat originated in

Thailand.  See Entry Documents.

Altogether, Seamaster, as the importer of record, entered four containers of crawfish tail

meat into the commerce of the United States through the Los Angeles/Long Beach Seaport by

means of documents filed with Customs that claimed the merchandise originated in Thailand.  Am.

Compl. ¶¶ 36–37.  The four entries were released for consumption, and Rupari sold some or all of

the entries to POPCA.  Am. Compl. ¶ 36; Porter Decl. ¶ 10.  All four entries were subject to a

201.63 percent antidumping duty under the Antidumping Duty Order.  Am. Compl. ¶ 38; United

States v. Am. Cas. Co. of Reading Pa., 39 CIT ___, ___, 91 F. Supp. 3d 1324, 1330 (2015), as

amended (Aug. 26, 2015) (Rupari I) (citing Antidumping Duty Order, 62 Fed. Reg. at 41,358).

Seamaster did not classify the entries as subject to antidumping duties, nor did it remit any amount

of the applicable duties to Customs.  Am. Compl. ¶ 34.

On May 4, 1998, Porter had a telephone conversation with Floyd, Rupari's Vice President

of Seafood Sales, regarding the crawfish tail meat purchased from Rupari and upcoming shipments

of frozen crawfish tail meat.  Am. Compl. ¶ 29; Porter Decl. ¶ 10.  According to Porter:

> During that conversation, I asked Larry [Floyd] how it was that
> Rupari could sell its Chinese crawfish tail meat so cheaply. I also
> commented that Rupari's crawfish was cheaper than all of the other
> Chinese crawfish tail meat being sold in the United States at that
> time. Larry responded that they, which I understood to be Rupari,
> "can get it in where it would not be known as Chinese crawfish." I
> asked Larry how and he explained that the Chinese crawfish tail
> meat was shipped to Thailand where it was "processed." He said that
> the country of origin could be the place where the crawfish is
> packed. Larry also used the word "tariff," stating that Rupari's
> crawfish would not have to pay the same amount in tariffs. I
> responded, "Is that on the up-and-up?" I was uncomfortable with
> this approach and shared my concern with Larry.

Porter Decl. ¶ 10; Am. Compl. ¶ 30.  Later that day, Floyd sent Porter a facsimile on Rupari

letterhead, in which he wrote:

> As per our conversation on the telephone earlier concerning cooked
> peeled crawfish meat from Thailand, [sic] this product was cooked
> in China and sent to Thialand [sic] in the whole round and totally
> processed in Thialand [sic] and packed under the Seamaster lable
> [sic]. I really don't understand what all the comotion [sic] is all about
> because we could bring in the whole cooked product into the United
> States and peel and pack it here and it would become product of the
> U.S.A.

Am. Compl. ¶ 31; Ans. ¶ 31; Def. RPSF ¶ 26; Pl.'s Opp'n Ex. 20 at 1, Fax from Floyd to Porter,

May 4, 1998, ECF No. 94-11.

Between June 13 and June 20, 1998, Seamaster, as the importer of record, attempted five

additional entries of frozen cooked peeled crawfish meat or frozen crawfish meat, and the entries

were detained by Customs.[7]  Am. Compl. ¶¶ 39–40, 42;  Ans. ¶¶ 39–40, 42; Def. RPSF ¶¶ 30–31;

Pl.'s Ex. 11B at 1–28, Opp'n Entry/Immediate Delivery Forms, Certificates of Origin, Bills of

Lading, Invoices, ECF No. 94-8 ("Attempted Entry Documents").   Seamaster classified the

crawfish tail meat in these five entries as duty free under 1605.40.1000 HTSUS.  Am. Compl. ¶

40; Ans. ¶ 40; Attempted Entry Documents at 1–28.  Seamaster labeled all five entries as products

of Thailand.  Am. Compl. ¶ 40; Ans. ¶ 40; Attempted Entry Documents at 1–28.  The crawfish tail

meat was subject to antidumping duties of 201.63 percent, because it originated in China, but

Seamaster did not classify the merchandise properly.  Am. ¶ 41; Ans. ¶ 41; Attempted Entry

Documents at 1–28; Antidumping Duty Order, 62 Fed. Reg. at 48,219.  Customs examined and

seized the five entries of crawfish tail meat under 19 U.S.C. § 1595a(c)(2)(E),[8] because the cartons

were intentionally marked as products of Thailand in violation of 19 U.S.C. § 1304.[9]  Am. Compl.

¶ 42; Ans. ¶ 42.

On June 26, 1998, Customs issued a request for information to Seamaster, as importer of

record, asking them to substantiate the claimed Thai origin of the five seized entries, and asking

for an explanation of Seamaster's relationships with Rupari and Sea Bonanza.  Am. Compl. ¶ 43;

---

[7] These five attempted entries were numbered 595-2093518-6, 595-2093516-0, 595-2093510-3, 595-2093512-9, and 595-2093514-5.  Am. Compl. ¶ 39.

[8] At the relevant time, 19 U.S.C. § 1595a(c)(2)(E) provided that "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law . . . may be seized and forfeited if . . . it is merchandise which is marked intentionally in violation of [19 U.S.C. § 1304]."

[9] At the relevant time, 19 U.S.C. § 1304 provided that "[e]xcept as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."

Ans. ¶ 43; Def. RPSF ¶ 33; Pl.'s Opp'n Ex. 13 at 1, U.S. Customs Service Request for Information,

June 26, 1998, ECF No. 94-10.  In response to the first request for information, Seamaster advised

that it was the exporter and importer, identified Rupari as the domestic buyer of the crawfish tail

meat entries, identified Sea Bonanza as the packer and producer of the crawfish, and stated that all

of the crawfish had been harvested at Mahyam Tingham in Thailand.  Def. RPSF ¶ 34.

On June 29, 1998, Customs commenced a fraud investigation against Rupari for the

possible circumvention of antidumping duties.  Pl.'s Opp'n Ex. 12, Tr. of Dep. of C. Vernon

Francis at 12, Sept. 24, 2013, ECF No. 94-9 ("Francis Dep.").

On July 1, 1998, Rupari, through its employee, Stilwell, filed a letter with Customs on

behalf of Seamaster, the importer of record, wishing to clarify the origin of the crawfish tail meat

in Seamaster's five entries.  Am. Compl. ¶ 44; Ans. ¶ 44; Def. RPSF ¶ 35; Pl.'s Opp'n Ex. 15 at

1, Letter from Stilwell to David Shaw, U.S. Customs Service, July 1, 1998, ECF No. 94-11.

Stilwell stated in the letter that the crawfish tail meat in the five seized entries was "cooked, peeled,

and processed" by Sea Bonanza at its plant in Thailand.  Am. Compl. ¶ 44; Ans. ¶ 44; Def. RPSF

¶ 36; Letter from Stilwell to David Shaw at 1.

On July 6, 1998, Customs issued a second request for information to Seamaster asking for

records from Sea Bonanza to substantiate the facts in the letter referenced claiming that the

crawfish tail meat was processed in Thailand from raw crawfish harvested in Thailand.  Am.

Compl. ¶ 45; Ans. ¶ 45; Pl.'s Opp'n Ex. 13 at 2–4, Second Request for Information.  On July 10,

1998, Rupari, through its employee Stilwell, filed documents in response to this second request

for information.  Am. Compl. ¶ 46; Def. RPSF ¶ 37.  One of those documents was a letter written

by Seamaster that authorized Rupari to act as Seamaster's representative in all dealings with

Customs related to the release of the seized entries of Chinese crawfish tail meat.  Am. Compl. ¶

46; Pl.'s Opp'n Ex. 23 at 46, Letter of Authorization from Seamaster to U.S. Customs, July 9, 1998, ECF No. 94-12.

On July 13, 1998, Customs issued a third request for information to Seamaster again asking for further substantiation of the claim that the crawfish originated in Thailand.  Am. Compl. ¶ 47; Ans. ¶ 47; Pl.'s Opp'n Ex. 13 at 5, Third Request for Information, July 13, 1998.

On July 13, 1998, Rupari, through its employee Stilwell, filed a series of documents with Customs.  Am. Compl. ¶ 48; Ans. ¶ 48.  Among those documents was a purported letter from Mahyam Tingham Fisheries Co. Ltd. stating that it had cultivated crawfish in Bangkok, Thailand, which it had sold to Sea Bonanza, complete with invoices for the sale of live crawfish.  Am. Compl. ¶ 48; Ans. ¶ 48; Pl.'s Opp'n Ex. 15 at 25, Letter of Explanation from Mahyam, July 10, 1998.  The Bureau of Business Information of the Government Service Division in Thailand has confirmed that they failed to find any business registration for the name "Mahyam Tingham Fisheries Co., Ltd." Pl.'s Opp'n Ex. 18, Letter from the Bureau of Business Information of Thailand to Ms. Barry Tang, May 10, 2013, ECF No. 94-11.  There was also a letter from Sea Bonanza stating that it purchased raw crawfish from Mahyam that it processed into tail meat for sale to Seamaster, which Seamaster then imported into the United States.  Am. Compl. ¶ 50; Ans. ¶ 50; Pl.'s Opp'n Ex. 23 at 47, Letter of Confirmation from Sea Bonanza, July 10, 1998.

On or about July 20, 1998, Customs monitored a call between Floyd and a confidential informant, during which Floyd confirmed that Rupari was getting crawfish tail meat from China that had been peeled in Thailand.  Confidential Ex. 2, Transcribed call between confidential informant and Floyd, July 20, 1998, ECF. No. 76.

On July 25, 1998, Wang, the owner of Yupeng, sent a facsimile to Rupari, specifically to Floyd, Stilwell, and Rupari's President, Robert Mintz, by fax regarding the five seized entries,

which stated that Yupeng did not have the money to pay the ocean freight to ship crawfish to Thailand; however, Yupeng would fulfill Rupari's order of "whole crawfish" which could be mixed with "ten tons of crawfish meat."  Am. Compl. ¶ 55; Def. RPSF ¶ 38; Pl.'s Opp'n Ex. 16, Facsimile from Wang to Rupari, July 25, 1998, ECF No. 94-11.

Sea Bonanza never processed live crawfish.  Am. Compl. ¶ 22; Def. RPSF ¶ 17.  As noted supra, the Bureau of Business Information of the Government Service Division in Thailand has confirmed that they could not find any business registration for the name "Mahyam Tingham Fisheries Co., Ltd."  Am. Compl. ¶ 49; Letter from the Bureau of Business Information of Thailand to Ms. Barry Tang.  Also as noted, the Agricultural Affairs Office of the American Embassy in Thailand confirmed that there was no commercial production of indigenous freshwater crawfish in Thailand.  Am. Compl. ¶ 56; Facsimile from Agricultural Affairs Office, American Embassy, Bangkok, Thailand, to Roy Johnson, Louisiana Dept. of Agriculture.  Dr. Greg Lutz, Ph.D., an expert in crawfish, has confirmed that the crawfish tail meat in question in this matter did not originate at Mahyam Tingham, and environmental requirements do not exist in Thailand for commercial production levels of crawfish.  Pl.'s Br. Ex. 3, Tr. of Dep. of Charles Gregory Lutz, Ph.D. at 36–37, Apr. 30, 2015.

B. Procedural Background

On April 9, 2001, Customs issued Rupari and Stilwell a Pre-penalty Notice which set the tentative determination of the level of culpability at fraud, but also noted that "[i]nasmuch as the Government may plead in the alternative in any de novo proceeding before the Court of International Trade, Customs alternatively alleges that the violation in question occurred as a result of negligence or gross negligence."  Pl.'s Opp'n Ex. 19 at 1–2, Pre-penalty Notice, Apr. 9, 2001, ECF No. 94-11 ("Pre-penalty Notice").  On November 14, 2001, Customs issued Rupari and

Stilwell a Penalty Notice, which included the same language as the Pre-penalty Notice.  Pl.'s Opp'n

Ex. 24 at 18–20, Penalty Notice, Nov. 14, 2001, ECF No. 94-13 ("Penalty Notice").

On April 7, 2010, Customs filed a complaint against American Casualty Co. of Reading

Pennsylvania ("American Casualty"), claiming that it owed the United States $1,279,648.83 plus

statutory interest for unpaid customs duties under bonds pursuant to 19 U.S.C. §§ 1505, 1592(d),

1505(c), and 580.  Original Compl. Against American Casualty ¶ 1, April 7, 2010, ECF No. 2.

American Casualty issued customs bonds to Seamaster for the importation of the four completed

crawfish tail meat entries in March and April 1998.  Id. ¶ 6, Customs Bonds Ex. A at 2–5, Apr. 15,

1998, ECF No. 2-1.  American Casualty, as surety, guaranteed payment for any duty, tax, or

charge, or compliance with law or regulation, as a result of Seamaster's imports.  Original Compl.

Against American Casualty ¶ 6.

In a separate proceeding, on June 20, 2011, Customs filed a complaint against Rupari and

Stilwell for violations of 19 U.S.C. § 1592(a).  Original Compl. Against Rupari ¶ 1, June 20, 2011,

Ct. No. 11-00203, ECF No. 2.  The complaint in that proceeding alleged that Rupari attempted to

enter five containers of Chinese crawfish tail meat by means of documents falsely claiming that

the crawfish tail meat originated in Thailand.  Id. ¶ 8.  Customs sought the domestic value of the

merchandise Rupari attempted to enter into the United States, or in the alternative, the maximum

amount for grossly negligent or negligent violations of 19 U.S.C. § 1592.  Id. ¶ 52 & Attach. A.

The domestic value of the merchandise is $2,784,636.18, which is the sum total of the invoice

value of the five seized attempted entries, the antidumping duties owed on those entries assessed

at 201.63 percent, and other costs, fees, and profit associated with those entries.[10]  Id. Attach. A.

---

[10] The domestic value of entry 595-2093518-6 is $566,245.90, equivalent to an invoice total of
$177,700.00, plus $358,296.51 in antidumping duties owed, plus other costs, fees, and profit of
$30,249.39.  The domestic value of entry 595-2093516-0 is $573,739.83, equivalent to an invoice

On December 22, 2011, this Court ordered that the case against American Casualty be consolidated with the case against Rupari, constituting the instant case.  ECF No. 22.

On May 13, 2013, Stilwell died.  Def.'s Mot. to Dismiss Ex. 5 at 1, Death Certificate, July 19, 2013, ECF No. 75-5.  Additionally, Floyd died, however, his date of death is not known by the court.  Rupari I, 91 F. Supp. 3d at 1332.  Pursuant to USCIT Rule 41(a)(1)(A)(ii), on July 21, 2015, the parties stipulated partial dismissal of this case as to Stilwell.  ECF No. 105.

Rupari filed a motion to dismiss this action on December 9, 2013, and a revised motion to dismiss on November 3, 2014, arguing that the Government had failed to properly allege fraud, Count I of the original complaint, with particularity, and that Customs had failed to exhaust its administrative remedies regarding its gross negligence and negligence claims, Counts II and III of the original complaint, respectively.  ECF Nos. 47–48, 75–76.  The Government filed a response in opposition to Rupari's motion to dismiss on March 16, 2015.  Pl.'s Opp'n.  Rupari filed its reply in support of its motion to dismiss on March 29, 2015.  ECF Nos. 97–98.  Oral argument on the motion to dismiss was held before this court on July 21, 2015.  ECF No. 106.  On August 24, 2015, the court found that the Government alleged fraud with particularity, and that administrative remedies had been properly exhausted for gross negligence and negligence.  Rupari I, 91 F. Supp. 3d at 1334–39; ECF Nos. 107–08.  The court thus denied Rupari's motion, granted the

---

total of $179,950.00, plus $362,833.19 in antidumping duties owed, plus other costs, fees, and profit of $30,596.64.  The domestic value of entry 595-2093510-3 is $573,379.83, equivalent to an invoice value of $179,950.00, plus $362,833.19 in antidumping duties owed, plus other costs, fees, and profit of $30,596.64.  The domestic value of entry 595-2093512-9 is $522,260.85, equivalent to an invoice value of $163,821.00, plus $330,312.28 in antidumping duties owed, plus other costs, fees, and profit of $28,127.57.  The domestic value of entry 595-2093514-5 is $549,369.77, equivalent to an invoice value of $172,371.00, plus $347,551.65 in antidumping duties owed, plus other costs, fees, and profit of $29,447.12.  Orig. Compl. Against Rupari Attach. A; see Benitez Decl. ¶¶ 3–5.

Government's request for leave to amend its complaint, and ordered that proceedings continue

pursuant to a revised schedule.  Rupari I, 91 F. Supp. 3d at 1338–39.

The Government filed a motion for summary judgment on January 15, 2015.  ECF Nos.

79–81.  On August 31, 2015, the Government filed its amended complaint as to Rupari.  Am.

Compl.  On February 24, 2016, Rupari filed a response in opposition to the Government's motion

for summary judgment, and cross-moved for summary judgment.  ECF Nos. 119–20.  Also on

February 24, 2016, American Casualty filed a response in opposition to the Government's motion

for summary judgment, and cross-moved for summary judgment.  ECF No. 118.  Pursuant to

USCIT Rule 41(a)(1)(A)(ii), on March 21, 2016, the parties stipulated partial dismissal of this case

as to American Casualty.  ECF No. 121.  Rupari then became the sole remaining defendant in this

case.

Further briefing on the motions for summary judgment was subsequently stayed and the

corresponding deadlines extended multiple times.  See Order, April 15, 2016, ECF No. 131;

Scheduling Order, October 17, 2016, ECF No. 138.  Following the retirement of the original judge,

this case was reassigned to a new judge on September 21, 2016.  ECF No. 136.

C.  Rupari's Bankruptcy and Default

Beginning on February 17, 2017, the parties filed, and the court granted, several motions

to stay proceedings, in which the parties represented that they were attempting, in good faith, to

resolve this action by way of settlement.  See ECF Nos. 139–47.  However, on April 10, 2017,

Rupari filed for Chapter 11 bankruptcy protection.  See In re Rupari Food Servs., Inc., No. 17–

10794 (Bankr. D. Del. filed Apr. 10, 2017).  The court maintained the stay on briefing, and ordered

that parties report to the court their joint position or, in the absence of a joint position, their

respective positions regarding the applicability to this proceeding of the automatic stay effected

by 11 U.S.C. § 362(a) (2012), or recommend what further action, if any, be taken in this action

prior to the resolution of the bankruptcy proceeding.  ECF No. 149.  The Government reported its

position on July 3, 2017, maintaining that it was seeking entry, but not execution, of a monetary

judgment, and that the civil penalty action pursuant to 19 U.S.C. § 1592(a), commenced to enforce

police or regulatory powers, was exempt from the automatic stay provision of the bankruptcy

statute pursuant to 11 U.S.C. § 362(b)(4).  ECF No. 154.  Rupari reported its opposing position on

July 27, 2017.  ECF No. 160.

        During this time period, on June 30, 2017, counsel for Rupari moved to withdraw their

representation in this case pursuant to USCIT Rule 75(d).  ECF No. 153.  Counsel filed an amended

motion to withdraw on July 20, 2017.  ECF No. 159.  The Government responded in opposition to

the motion to withdraw on August 1, 2017.  ECF No. 163.  Counsel for Rupari filed a reply on

August 9, 2017.  ECF No. 166.

        On August 10, 2017, as a matter of first impression, the court found that this 19 U.S.C. §

1592 civil penalty action was exempt from the automatic stay in bankruptcy by virtue of 11 U.S.C.

§ 362(b)(4), insofar as it constitutes an action for the entry, rather than the enforcement, of a money

judgment against Rupari.  United States v. Rupari Food Servs., Inc., 41 CIT ___, 254 F. Supp. 3d

1367 (2017).

        On August 23, 2017, the court granted counsel's amended motion to withdraw, and ordered

that Rupari had thirty days thenceforth to retain substituted counsel.  ECF No. 169.  The court

noted that, should Rupari fail to retain substitute counsel, it would entertain a motion for default

judgment upon the Government's filing pursuant to USCIT Rule 55.  Id.  Rupari was electronically

served notice of the court's order on the same day.  Id.  Rupari was served by mail on October 23,

2017.  Proof of Service, Oct. 27, 2017, ECF No. 170.

Regarding default, USCIT Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  As to representation before this Court, USCIT Rule 75(b)(1) provides that "[e]xcept for an individual (not a corporation, partnership, organization or other legal entity) appearing pro se, each party and any amicus curiae must appear through an attorney authorized to practice before the court."  See Lady Kelly, Inc. v. U.S. Sec'y of Agric., 30 CIT 82, 83, 414 F. Supp. 2d 1298, 1299 (2006) ("The rule is well established that a corporation must always appear through counsel.") (citing Rowland v. Cal. Men's Colony, 506 U.S. 194, 201–02 (1993)).

Rupari failed to retain substitute counsel within thirty days as required by the court's August 23, 2017 order -- and has not retained substitute counsel since then.  Because Rupari is a corporation, is required to be represented by counsel, discharged its counsel on June 30, 2017, and failed to retain substitute counsel, the Government requested entry of default pursuant to USCIT Rule 55(a) on November 1, 2017.  ECF No. 171.  The clerk of the court entered default against Rupari on the following day.  ECF No. 172.

Finally, on December 18, 2017, the Government moved for default judgment pursuant to USCIT Rule 55(b).  Pl.'s Br.; USCIT R. 55(b) ("In all cases the party must apply to the court for a default judgment.").  Rupari has not retained substitute counsel and did not respond to the Government's motion.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1582(1).  The court reviews all issues de novo in actions under Section 1592.  19 U.S.C. § 1592(e)(1).

## DISCUSSION

In a motion for default judgment, the moving party must first demonstrate to the Clerk of the Court by affidavit or otherwise that the opposing party has failed to plead or otherwise defend. USCIT R. 55(a). Upon such a showing, the Clerk must enter default, as has occurred here. Id. USCIT Rule 55(b) mandates that "[w]hen the plaintiff's claim is for a sum certain or for a sum that can be made certain by computation, the court--on the plaintiff's request with an affidavit showing the amount due--must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing."

A defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint. See NYCC 1959, 182 F. Supp. 3d at 1347 (citing Mickalis, 645 F.3d at 137); Deladiep, 255 F. Supp. 3d at 1336 (citing Au Bon Pain, 653 F.2d at 65). The defaulting party's admission of liability for all well-pleaded facts, however, does not also function as an admission of damages. See United States v. Freight Forwarder Int'l, Inc., 39 CIT ___, ___, 44 F. Supp. 3d 1359, 1362 (2015) (citing Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012)); Deladiep, 255 F. Supp. 3d at 1336. Thus, when considering a motion for default judgment, the Court accepts as true all well-pleaded facts in the complaint, but must reach its own legal conclusions. See United States v. Callanish, Ltd., 37 CIT ___, ___, 2013 WL 1277018, *2 (Mar. 28, 2013).

Accordingly, pursuant to USCIT Rule 55(b), the court must enter judgment against Rupari if (1) the Government's allegations establish Rupari's liability as a matter of law, and (2) "the plaintiff's claim is for a sum certain or for a sum that can be made certain by computation." USCIT R. 55(b); see NYCC 1959, 182 F. Supp. 3d at 1347 (citing Mickalis, 645 F.3d at 137).

I.      Accepted as True, the Government's Factual Allegations Establish Rupari's Liability as a
        Matter of Law.

        Section 1592 prohibits the entry of merchandise into the commerce of the United States by

means of "any document or electronically transmitted data or information, written or oral

statement, or act which is material and false," if the responsible person acted with "fraud, gross

negligence, or negligence."  19 U.S.C. § 1592(a)(1)(A)(i).  In Count I of its complaint, Am. Compl.

¶¶ 70–72, the Government alleges fraud.  An alleged violation of Section 1592 is determined to be

fraudulent "if a material false statement, omission, or act in connection with the transaction was

committed (or omitted) knowingly, i.e., done voluntarily and intentionally, as established by clear

and convincing evidence."  19 C.F.R. Pt. 171, App. B(C)(3); see 19 U.S.C. § 1592(e)(2) ("[I]f the

monetary penalty is based on fraud, the United States shall have the burden of proof to establish

the alleged violation by clear and convincing evidence[.]").

        A.  Rupari's Statements Were Material and False.

        Here, clear and convincing evidence establishes the materiality and falsehood of Rupari's

representations to Customs.  Rupari, on behalf of Seamaster, attempted to enter merchandise into

the commerce of the United States using entry documents that falsely indicated to Customs that

the merchandise in question was not subject to any antidumping duties.  Am. Compl. ¶¶ 70–72.

Specifically, Rupari asserted that the merchandise originated in Thailand, and was thus duty-free,

when in fact it originated in China.

        On the well-pleaded facts in the Government's complaint, which Rupari has admitted, see

NYCC 1959, 182 F. Supp. 3d at 1347 (citing Mickalis, 645 F.3d at 137), the merchandise in

question -- crawfish from China -- was in actuality subject to the Antidumping Duty Order,

whereas Rupari attempted to enter the merchandise duty-free as a product of Thailand.  See

Antidumping Duty Order.  The false information that Rupari submitted to Customs at the time of

its attempted entries was material to Customs' evaluation of Rupari's duty liability for these entries

because it affected Rupari's antidumping duties.  See NYCC 1959, 182 F. Supp. 3d at 1348 (citing

United States v. Rockwell Int'l Corp., 10 CIT 38, 42, 628 F. Supp. 206, 210 (1986) ("[T]he

measurement of the materiality of the false statement is its potential impact upon Customs'

determination of the correct duty for the imported merchandise.")); 19 C.F.R. Pt. 171, App. B(B)

(2013) (defining materiality for purposes of Section 1592 as being "[a] document, statement, act,

or omission is material if it has the natural tendency to influence . . . a Customs action regarding

the classification, appraisement, or admissibility of merchandise[,] . . . determination of an

importer's liability for duty[,] . . . [or] determination as to the source, origin, or quality of

merchandise."); Am. Compl. ¶ 61.

Therefore, the Government's factual allegations, deemed admitted by Rupari as the

defaulting party, establish that Rupari entered or attempted to enter merchandise into the

Commerce of the United States by submission of information that was both material and false.

B.  Rupari Knowingly Submitted Material and False Statements to Customs.

The following admitted facts constitute clear and convincing evidence establishing that

Rupari "voluntarily and intentionally," and therefore "knowingly,"[11] submitted materially false

_____

[11] The knowledge of Rupari's employees, as described in the record before the court, is imputed
to Rupari under principles of agency law.  This Court has previously applied principles of agency
law to customs violations under 19 U.S.C. § 1592 fraud actions.  See United States v. Greenlight
Organic, Inc., 41 CIT ___, ___, 2017 WL 6504002, at *2 (Dec. 18, 2017); United States v. Pan
Pac. Textile Grp., Inc., 29 C.I.T. 1013, 1022–24, 395 F. Supp. 2d 1244, 1251–55 (2005).  Agency
is defined as "the fiduciary relationship that arises when one person (a 'principal') manifests assent
to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the
principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement
(Third) Of Agency § 1.01 (2006).  "Corporations act through their employees; the general rule is
that an agent's knowledge is imputed to the principal when employees are acting within the scope
of their authority or employment, absent special circumstances."  Kellogg Brown & Root Servs.,
Inc. v. United States, 728 F.3d 1348, 1369 (Fed. Cir. 2013), opinion corrected on denial of reh'g,
563 F. App'x 769 (Fed. Cir. 2014); see Long Island Sav. Bank, FSB v. United States, 503 F.3d

information to Customs, and thus are sufficient to establish Rupari's liability under 19 U.S.C. §

1592 for a monetary penalty based on fraud.  19 U.S.C. § 1592(a)(1)(A)(i), (e)(2).  The court again

notes that these facts are deemed admitted by Rupari as the defaulting party.  See NYCC 1959,

182 F. Supp. 3d at 1347 (citing Mickalis, 645 F.3d at 137).

Rupari knew that Wang, Yupeng's owner, had created Seamaster in Thailand in November

1997, shortly after Commerce's antidumping order relating to Chinese crawfish tail meat became

effective in August 1997 and imposed a 201.63 percent antidumping duty on any of Yupeng's

crawfish tail meat exports to the United States.  Am. Compl. ¶¶ 9 18.  Rupari knew that the crawfish

tail meat that it was purchasing from Seamaster originated in China and, through Floyd, Rupari's

Vice President of Seafood Sales, stated as much to Porter of POPCA approximately two months

before submitting to Customs the documents containing the false statement that Seamaster's

crawfish tail meat was harvested, processed, and packed in Thailand.  Am. Compl. ¶¶ 23–31.

Indeed, Porter testified that during his May 4, 1998 conversation with Floyd, in response to

Porter's inquiry as to how Rupari's crawfish was cheaper than all of the other Chinese crawfish

tail meat being sold in the United States at the time, Floyd responded that Rupari could "get it in

where it would not be known as Chinese crawfish."  Am. Compl. ¶ 30.  Further, in its May 4, 1998

statement to Porter concerning these and other entries, Rupari, through Floyd, stated that the

crawfish that it was supplying to Popeye's was cooked in China and sent to Thailand, and packed

under the Seamaster label.  Am. Compl. ¶ 31.  This statement to POPCA, the company that had

---

1234, 1250 (Fed. Cir. 2007) (explaining the general rule of imputation of a culpable state of mind
in the context of common-law fraud); Jones v. N.Y. Guar. & Indem. Co., 101 U.S. 622, 628 (1879)
("A corporation can act only by its agents.").  Here, the record firmly establishes, and it is not
disputed, that employees acting in the scope of their employment for Rupari acted as Rupari's
agents during the events that gave rise to the instant action.

ordered the crawfish tail meat from Rupari and from whom Rupari stood to profit, constitutes an admission by Rupari that it knew, months before its false submissions to Customs, that Seamaster's crawfish originated in China, and not in Thailand.

Between June 13 and June 20, 1998, Seamaster attempted to enter five shipments of crawfish tail meat into the United States, which entries were classified as duty free under HTSUS subheading 1605.40.1000 and labeled as products of Thailand.  Am. Compl. ¶¶ 39–40.  Customs examined and seized the five entries of crawfish tail meat under 19 U.S.C. § 1595a(c)(2)(E) because the cartons were intentionally marked as products of Thailand -- when they originated in China -- in violation of 19 U.S.C. § 1304.  Am. Compl. ¶ 42.

In June and July of 1998, Rupari submitted, on behalf of Seamaster, numerous documents to Customs containing false information that were intended to secure the release of Seamaster's five seized crawfish tail meat entries into the commerce of the United States.  Am. Compl. ¶¶ 44– 53.  In response to requests for information that sought to verify the country of origin of Seamaster's crawfish tail meat entries, Rupari initially falsely advised Customs that Seamaster's crawfish tail meat had been cooked, peeled, and processed at Sea Bonanza in Thailand.  Am. Compl. ¶ 44.  Rupari afterwards submitted documents to Customs that stated that Sea Bonanza produced crawfish tail meat from raw crawfish harvested by Mahyam Tingham.  Am. Compl. ¶¶ 48, 50.  However, there is no record that Mahyam Tingham existed, or that there was commercial production of crawfish in Thailand.  Am. Compl. ¶¶ 49, 56.  Further, although it contracted with Seamaster to repack frozen crawfish tail meat and label it a product of Thailand, Sea Bonanza never processed raw crawfish.  Am. Compl. ¶¶ 19, 21–22, 51.  In addition, Rupari had never purchased crawfish from a source in Thailand prior or subsequent to purchasing crawfish from Seamaster, a company created by Rupari's Chinese crawfish tail meat supplier after the

Antidumping Duty Order had been issued and the dumping rate of 201.3 percent had been established. Am. Compl. ¶¶ 50–53. Seamaster admitted that the crawfish tail meat in its seized entries originated in China, and not in Thailand. Am. Compl. ¶ 57. Therefore, although Rupari submitted documents to Customs that Sea Bonanza purchased live crawfish from Thailand, and cooked, peeled, and processed that crawfish into crawfish tail meat, Rupari knew that the information it supplied to Customs was false.

Even assuming arguendo that Rupari was unaware that the crawfish in the seized entries originated in China, and not Thailand, and were thus subject to the Antidumping Duty Order, it regardless learned that information soon after the seizure and withheld it from Customs. Less than a month after Rupari submitted false material information to Customs, on or about July 20, 1998, Customs monitored a call between Floyd and a confidential informant, during which Floyd confirmed that Rupari was getting crawfish tail meat from China that had been peeled in Thailand. Am. Compl. ¶ 54. On July 25, 1998, Yupeng sent a fax to Rupari that discussed the fact that certain additional shipments of its Chinese crawfish tail meat were still at the wharf and that Yupeng could not afford to ship them to Thailand because of the seizure of the five entries. Am. Compl. ¶ 55.

II.     The Alleged Penalty Amount is Proper.

Section 1592 provides a maximum civil penalty amount for penalties based on fraudulent violations. 19 U.S.C. § 1592(c)(1). "A fraudulent violation of [§ 1592(a)] is punishable by a civil penalty in an amount not to exceed the domestic value of the merchandise." Id. As noted supra, per USCIT Rule 55(b), "[w]hen the plaintiff's claim is for a sum certain or for a sum that can be made certain by computation, the court--on the plaintiff's request with an affidavit showing the

amount due--must enter judgment for that amount and costs against a defendant who has been

defaulted for not appearing."

Here, the Government seeks a civil penalty in the amount of the domestic value of the

merchandise.  Pl.'s Br. at 1.  The Government alleges, and provides supporting evidence, that the

domestic value of the merchandise Rupari attempted to enter into the United States was

$2,784,636.18.  Id.; Benitez Decl. ¶¶ 3, 10; Attach. A; Am. Compl. ¶ 63.  In its supportive

evidence, the Government provided a breakdown of Customs' assessments of the costs associated

with each attempted entry.  Attach. A; Benitez Decl. ¶¶ 3–5, 9.  The breakdown reflects the invoice

value, antidumping duties owed based on the Antidumping Duty Order rate of 201.63 percent, and

other costs, fees, and profit associated with each attempted entry, resulting in a sum total of

$2,784,636.18.[12]  Attach. A; Benitez Decl. ¶¶ 3–5, 9.  Accordingly, the maximum allowable

penalty for Rupari's fraudulent violation of Section 1592 with respect to these entries is

$2,784,636.18.  See 19 U.S.C. § 1592(c)(1).

Customs took appropriate administrative steps pursuant to 19 U.S.C. § 1592(b) to perfect

its penalty claim against Rupari at the administrative level.  See 19 U.S.C. § 1592(b) (requiring

Customs' issuance of a pre-penalty notice and subsequently a penalty claim, and providing an

opportunity to respond); United States v. Ford Motor Co., 463 F.3d 1286, 1298 (Fed. Cir. 2006).

On April 9, 2001, Customs issued a pre-penalty notice to Rupari proposing a monetary penalty on

the basis of fraud and in an amount equal to the domestic value of all four entered entries and the

five seized entries of Chinese crawfish tail meat.  Am. Compl. ¶ 65 (citing Pre-penalty Notice).

Customs also asserted alternative penalties on the basis of gross negligence and negligence in the

pre-penalty notice.  Id.  On November 21, 2001, Customs issued a penalty notice to Rupari and

---

[12] See supra n.10.

Stilwell assessing penalties against these parties for fraudulent violations of 19 U.S.C. § 1592(a) based on their actions in aiding the entry and attempting to enter the Chinese crawfish tail meat by means of false, material representations concerning the country of origin of the merchandise.  Am. Compl. ¶ 66 (citing Penalty Notice).  Customs again asserted alternative penalties on the basis of gross negligence and negligence in the penalty notice.  Id.  On May 14, 2002, Customs issued a demand for unpaid duties against Rupari to recover the antidumping duties that were avoided on the entries.  Am. Compl. ¶ 67.  These penalties remain unpaid.  Am. Compl. ¶ 69.

The Government's assessed penalty is equivalent to the domestic value of the merchandise and is therefore within the scope of authority provided by 19 U.S.C. § 1592(c)(1).  Because Rupari has defaulted, it raises no equitable claim, argument, or factual allegations supportive of a lesser penalty amount.   Judgment  shall  therefore  be  entered  for  the  unpaid  penalty  amount  of $2,784,636.18, plus post-judgment interest, see 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."), (b), and costs.  See USCIT R. 54(d)(1) ("Unless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party."), 55(b) (mandating inclusion of costs in default judgment).

## CONCLUSION

For the foregoing reasons, the Government's motion for a default judgment against Rupari for a fraudulent violation of 19 U.S.C. § 1592(a) is granted.  Judgment shall be entered in the amount of $2,784,636.18, plus post-judgment interest, computed in accordance with 28 U.S.C. § 1961(a)–(b), plus costs.  Accordingly, the court need not reach the Government's alternative claims based on gross negligence and negligence contained in Counts II and III of its complaint. Am. Compl. ¶¶ 73–78.  Any outstanding motions in this case are dismissed as moot.

**SO ORDERED**.

                                                                /s/ *Gary S. Katzmann*
                                                                        Judge

Dated: March 9, 2018
            New York, New York